1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

10

PERCY LAVAE BACON,

    *Petitioner*,

2:07-cv-00821-KJD-RJJ

11

vs.

ORDER

12
13

HOWARD SKOLINIK, *et al.*,

14

    *Respondents*.

15
16

      This habeas matter under 28 U.S.C. § 2254 comes before the Court for decision.

17 Petitioner Percy Lavae Bacon seeks to set aside his 2005 Nevada state conviction, pursuant

18 to a jury verdict, on a total of fifteen charges, including five felony counts each of burglary,

19 forgery, and theft.  According to the evidence presented by the State at trial, the charges

20 arose from a series of transactions in which Bacon drained a total of $17,950.00 from the

21 bank accounts of two elderly twin sisters, one of whom was incapacitated in a nursing home

22 at the relevant time.  Bacon elected to represent himself at trial.

23

### *Governing Standard of Review*

24       The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

25 deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333

26 n. 7, 117 S.Ct. 2059, 2066 n.7,138 L.Ed.2d 481 (1997).  Under this deferential standard of

27 review, a federal court may not grant habeas relief merely on the basis that a state court

28 decision was incorrect or erroneous.  *E.g., Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir.

2003).  Instead, under 28 U.S.C. § 2254(d), the federal court may grant habeas relief only if the decision: (1) was either contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16, 124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 17, 124 S.Ct. at 11.  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g.,* *Mitchell*, 540 U.S. at 18,124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

To the extent that the state court's factual findings are challenged intrinsically based upon evidence in the state court record, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.  Rather, the AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.  If the state court factual findings withstand intrinsic review under this deferential standard, they then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may be overturned based on new evidence offered for the first time in federal court, if other procedural prerequisites are met, only on clear and convincing proof.  393 F.3d at 972.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.  *Davis*, 333 F.3d at 991.

## *Discussion*

### *Ground 1:  Grand Jury Appearance in Restraints and Jailhouse Attire*

In Ground 1 of the amended petition, petitioner alleges that he was denied due process in violation of, *inter alia*, the Fourteenth Amendment when the State had him in restraints and jailhouse attire when he voluntarily appeared before a state grand jury.

The Supreme Court of Nevada rejected the due process claim presented on direct appeal in this regard on the following grounds:

> . . . Bacon contends that he was deprived of due process of law when he appeared before the grand jury dressed in jail attire and in the custody of a law enforcement officer.  "[I]t is a violation of the defendant's due process rights for a state to compel an accused to stand trial in prison clothing, as prison attire is inconsistent with the presumption of innocence mandated by the constitution."[FN4]  Here, Bacon was not compelled to testify before the grand jury, the grand jury was not deciding Bacon's guilt or innocence, and the law enforcement officer's presence was justified by the State's interest in maintaining custody of Bacon.[FN5]  Accordingly, Bacon was not deprived of due process of law during his appearance before the grand jury.
>
> [FN4] Barker v. Wingo, 407 U.S. 514, 530-33 (1972).
>
> [FN5] Sheriff v. Berman, 99 Nev. 102, 107, 659 P.2d 298, 301 (1983).

#61, Ex. 125, at 2.

1    The Nevada Supreme Court's rejection of this claim was neither contrary to nor an
2    objectively unreasonable application of clearly established federal law as established by the
3    decisions of the United States Supreme Court.

4    Petitioner relies upon cases, including the *Barker v. Wingo* decision cited by the
5    Supreme Court of Nevada on the direct appeal, holding that it generally is a violation of due
6    process to compel a defendant to stand trial in physical restraints and jailhouse attire.

7    None of the petitioner's cases, however, concern an appearance before a grand jury.
8    The distinction is a significant one.  Longstanding United States Supreme Court precedent
9    establishes that the right to presentation of a criminal case to a grand jury in federal criminal
10   proceedings under the Fifth Amendment does not extend to the States through the
11   Fourteenth Amendment.  *See Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed.
12   232 (1994); *accord Apprendi v. New Jersey*, 530 U.S. 466, 477 n.3, 120 S.Ct. 2348, 2356 n.3,
13   147 L.Ed.2d 435 (2000); *id.*, 530 U.S. at 499, 120 S.Ct. at 2368 (Thomas, J., concurring).[1]
14   In *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), hearkening back
15   to *Hurtado*, the Supreme Court noted that there was an unresolved question as to whether
16   the Due Process Clause of the Fourteenth Amendment "requires the State, having once
17   resorted to a grand jury procedure, to furnish an unbiased grand jury."  369 U.S. at 545-46,
18   82 S.Ct. at 957-58.  The Supreme Court did not resolve this issue in *Beck*, stating that "it is
19   not necessary for us to determine this question" and further stating that it was "a question
20   upon which we do not remotely intimate any view."  *Id.*  In the forty-six years since *Beck*, the
21   Supreme Court has not resolved this unresolved issue.  It does not appear that there is any
22   Supreme Court decision holding that an error allegedly denying a defendant an unbiased and
23   impartial state grand jury gives rise to a federal due process violation.  Given that this issue
24   has expressly been left open by the United States Supreme Court, it does not appear that the
25   Nevada Supreme Court's rejection of Bacon's claim of error in the state grand jury

26   ───────────────────

27   [1]Petitioner argues at length that the grand jury clause of the Fifth Amendment applies to the States.
28   *Hurtado* directly holds to the contrary.  Petitioner's extensive reliance upon federal decisions regarding the
     grand jury requirement in federal criminal prosecutions thus is misplaced.

1  proceedings was an unreasonable application of clearly established federal law.  *Cf. Alberni*

2  *v. McDaniel*, 458 F.3d 860, 866 (9th Cir. 2006)(constitutional principle was not clearly

3  established if the Supreme Court had expressly concluded that the issue was an open

4  question).

5       Even more to the point, no Supreme Court authority holds that a state denies a

6  defendant due process when it has him appear in restraints and jailhouse attire during a

7  voluntary appearance before a grand jury.  Petitioner cites no apposite Supreme Court

8  authority holding that due process prohibits a state from producing an incarcerated defendant

9  in restraints and jailhouse attire for a voluntary grand jury appearance.  Under the AEDPA,

10  petitioner must provide more than argument and inapposite case law.  He instead must

11  demonstrate that the state court's rejection of his claim was either contrary to or an

12  unreasonable application of clearly established federal law as determined by the Supreme

13  Court.  In the absence of apposite Supreme Court authority addressing restraints and

14  jailhouse attire in the context of state grand jury proceedings, he cannot carry his burden.

15       The state supreme court's rejection of this claim accordingly was neither contrary to

16  nor an unreasonable application of clearly established federal law.

17       Ground 1 therefore does not provide a basis for federal habeas relief.[2]

18

19       [2]*See also United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986)(in federal
20  criminal proceeding, error in allowing two law enforcement agents to testify in tandem before grand jury, in
   violation of Fed. R. Crim. Pro. 6(d) was rendered harmless by subsequent conviction by petit jury at trial).
21  Petitioner's reliance upon equal protection cases that invalidate convictions due to racial and/or gender
   discrimination in grand jury selection is misplaced.  The present claim arises under the due process clause,
22  not the equal protection clause.  *See also Beck*, 369 U.S. at 554-55, 82 S.Ct. at 962-63 (rejecting attempt to
   recharacterize violation of state grand jury procedures as an equal protection claim).

23       Petitioner's reliance upon the federal criminal case in *Bank of Nova Scotia v. United States*, 487 U.S.
24  250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), similarly is misplaced.  Bacon argues that *Bank of Nova Scotia*
   implicitly overruled *Mechanik* and instead established a standard of prejudice that focuses upon the effect of
25  the error upon the grand jury proceedings rather than upon the intervening petit jury result.  In *Bank of Nova
   Scotia*, however, there was no intervening petit jury result because the indictment was dismissed before trial.
26  Nothing in *Bank of Nova Scotia* overrides the rule in *Mechanik* that a grand jury error is rendered harmless
   error by a subsequent conviction by a petit jury at trial.  *Accord People of Territory of Guam v. Muna*, 999 F.2d
27  397, 399 (9th Cir. 1993)(similar reading of the interplay between *Bank of Nova Scotia* and *Mechanik*).

28                                                                        (continued...)

-5-

***Ground 2:  Alleged Banking Law Violations***

In Ground 2 of the amended petition, petitioner alleges that he was denied unspecified constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments because the bank documents that were used against him allegedly were obtained in violation of unspecified provisions of the Bank Secrecy Act, the Right to Financial Privacy Act, and a Nevada state banking law provision.  He urges that the release of the bank documents to the police was done without authorization of "the" account holder, Helen Webster.  He further alleges that the bank investigator manufactured an affidavit of claimant form in order for the bank to comply with a requirement of existing legal process for release of the documents.

At the outset, it is subject to substantial question whether all of the above-stated legal and factual grounds have been fairly presented to and exhausted in the Supreme Court of Nevada.  To satisfy the exhaustion requirement, the claim must have been fairly presented to the state courts completely through to the highest court available, in this case the Supreme Court of Nevada.  *E.g., Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003)(*en banc*); *Vang v. Nevada*, 329 F.3d 1069, 1075 (9th Cir. 2003).  In the state courts, the petitioner must refer to the specific federal constitutional guarantee and must also state the facts that entitle the petitioner to relief on the federal constitutional claim.  *E.g., Shumway v. Payne*, 223 F.3d 983, 987 (9th Cir. 2000).  That is, fair presentation requires that the petitioner present the state courts with both the operative facts and the federal legal theory upon which his claim is based.  *E.g., Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003).

---

[2](...continued)

Petitioner refers in his responses to additional alleged wrongs regarding the grand jury proceedings, such as alleged illegal pretrial detention, alleged use of illegally obtained evidence and alleged knowing use of perjured testimony in the grand jury proceedings.  No such claims of alleged impropriety were included in the amended petition (#26) as to the grand jury proceedings.  Petitioner may not bring additional claims challenging the grand jury proceedings without filing a motion for leave to file an amended petition.  On any such motion seeking to bring new claims late in a habeas matter, petitioner would be required to demonstrate that the proposed amendment would not be futile due to, *inter alia*, untimeliness and/or lack of exhaustion of the new claims.  Petitioner may not simply start arguing new claims in his reply that were not alleged in the amended petition, without first complying with Rule 15 of the Federal Rules of Civil Procedure.  The Court would note further, however, that any such alleged error in the grand jury proceedings would appear to have been rendered harmless error by the intervening conviction before the petit jury.  *Cf. Mechanik, supra.*

1    In the present case, the only related claim presented by the petitioner to the Supreme

2    Court of Nevada on the represented direct appeal was a claim that probable cause did not

3    exist for the filing of the indictment because, *inter alia*, Helen Webster's signature on the

4    affidavit of claimant form was not made by her.  None of the claims under the various banking

5    statutes referred to in the federal petition were included in the arguments presented on direct

6    appeal.[3]  While petitioner filed sundry appeals and petitions for writs, it does not appear that

7    he presented any of these remaining claims to the state supreme court via a proper

8    procedural vehicle in which the merits of the claims would be reviewed.  Petitioner appears

9    to have had a state post-conviction petition pending in the state courts during the pendency

10    of this federal habeas action, but he has elected, indeed insisted, from the outset that this

11    federal habeas matter proceed forward on the claims currently before the Court.  It thus does

12    not appear on the present record that the majority of the legal theories presented in Ground

13    2 in fact have been fairly presented to and exhausted in the Supreme Court of Nevada.

14    On the claim that was presented on direct appeal -- the challenge to the indictment

15    regarding the alleged falsification of Helen Webster's signature on the affidavit of claimant

16    form -- the Supreme Court of Nevada rejected this claim on a state procedural ground.  The

17    state high court held that the claim was barred under N.R.S.34.700(1)(a) & (b) because the

18    pretrial petition presenting the claim was not filed timely and did not contain the required

19    waiver and consents.[4]  It thus would appear that the only exhausted portion of Ground 2 is

20    barred by procedural default, as the claim was rejected upon an adequate and independent

21    state law ground.  *See,e.g.,Bennet v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003).

22    Bacon urges that the Supreme Court of Nevada erred in finding the claim barred under

23    N.R.S. 34.700(1).  Petitioner points to a purported transcript of a proceeding wherein the

24    presiding judge in effect granted the defendants an extension of time to file a pretrial petition

25    until twenty-one days after the filing of the grand jury transcript.  See #69, at electronic docket

26

27    [3]See #61, Ex. 122, at 7-9.

28    [4]#61, Ex. 125, at 1.  See also #61, Ex. 123, at 6 (appellees' brief).

page 8 of 11.  However, the Nevada Supreme Court rejected Bacon's claim on direct appeal based not only upon untimeliness but also because the petition lacked the required statement as to waiver or consent.  It is established Nevada law that a pretrial petition that does not include the statutorily-required statement is not cognizable and may not be considered. *See,e.g., Sheriff v. Marshall*, 96 Nev. 304, 608 P.2d 1101 (1980).  The petitioner's arguments that the requirement should be ignored in his case are not persuasive.  It thus does not appear that the Nevada Supreme Court erred in finding the claim procedurally barred, and the issue further was a state law issue within the exclusive province of the state high court.

It thus would appear that Ground 2 is in large part unexhausted and further is procedurally defaulted to the extent that it has been exhausted.

In any event, even if, *arguendo*, Ground 2 were fully exhausted and not procedurally defaulted, this Court rejects the claims in Ground 2 on the merits, on *de novo* review.

First, Bacon has no standing to raise a violation of the federal or state banking statutes upon which he relies, even if they otherwise were applicable.  He was not an account holder on the Webster sisters' accounts, and he therefore had no standing to raise any alleged banking law violations regarding the accounts.  He presents no apposite case law holding that a criminal defendant in his situation has standing to raise an alleged violation of the account holders' rights under the banking statutes.[5]

Second, even if Bacon had standing to raise a violation of the Nevada state banking statute, a violation of a state law requirement does not present a claim that is cognizable on federal habeas review.  *See,e.g., Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007).  Petitioner presents no apposite case law holding that any such state banking law violation gives rise to a federal constitutional violation.

_____

[5]The cases cited by petitioner are inapposite.  For example, in *California Bankers Association v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), numerous bank customers, a bank, a bankers' association and an organization suing on behalf of itself and its bank customer members brought an action to enjoin the federal government from enforcing provisions of the Bank Secrecy Act requiring reporting to the federal government of transactions exceeding $10,000.  The case does in any way establish standing on the part of Bacon to challenge the manner in which the sisters' bank records were obtained.

1   Third, even if Bacon had standing to raise any federal banking violation, the violation

2   of a federal banking law, in and of itself, does not give rise to a constitutional violation of the

3   Fourth, Fifth, Sixth, or Fourteenth Amendments.  Bacon presents no apposite case law

4   holding that a violation of the statutes gives rise to a federal constitutional violation.

5   Fourth, to the extent that Bacon relies upon an alleged violation of the Fourth

6   Amendment, the claim is not cognizable on federal habeas review.  In *Stone v. Powell*, 428

7   U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the United States Supreme Court held that

8   "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment

9   claim, a state prisoner may not be granted federal habeas corpus relief on the ground that

10  evidence obtained in an unconstitutional search or seizure was introduced at his trial."  428

11  U.S. at 494, 96 S.Ct. at 3052 (footnote omitted).  While petitioner, who elected to represent

12  himself in the state district court criminal proceedings, may not have effectively pursued and

13  perfected the claims through the appropriate procedures, the procedures for raising a Fourth

14  Amendment claim nonetheless were available to him under Nevada state practice.  His claim

15  therefore is not cognizable on federal habeas review to the extent that he seeks to raise a

16  Fourth Amendment challenge under Ground 2.

17  Fifth, Bacon's underlying premise that an affidavit of claimant form was required for the

18  production of the banking records to the police has no supporting basis.  Bacon strenuously

19  urges that proper execution of an affidavit of claimant form was necessary for production of

20  banking records to the police.  However, he cites no apposite authority establishing that the

21  affidavit of claimant forms were a necessary prerequisite to producing the records, and the

22  record contains no support for this premise, which merely is a bald supposition by petitioner.

23  There is no indication in the state court record that the affidavit of claimant forms constituted

24  a basis either for obtaining relevant banking records or for obtaining a conviction.[6]  The

25  _____

26      [6]The State did not put the affidavit of claim forms into evidence at trial.  Rather, it was Bacon who
    elicited testimony regarding the affidavit of claimant forms on cross-examination of the bank officer.  #60, Ex.
27  87, Part A, at 70-75.  It further was Bacon, not the State, that requested that the affidavit of claimant forms be
    introduced into evidence at trial. #60, Ex. 90, at 49-53.  The banking records, including the checks, that were
28                                                                                                    (continued...)

-9-

1   petitioner's arguments regarding alleged irregularities with the affidavit of claimant forms –

2   including his arguments that banking records were thereby improperly obtained -- thus, at

3   bottom, constitute nothing more than a red herring.

4           Sixth, the circumstances surrounding the signatures on the affidavit of claim forms

5   were fully explored at trial.  Bacon maintains that the forms were defective (vis-à-vis his

6   unsupported premise that the forms constituted a prerequisite to producing bank records to

7   the police) because Helen Webster's signature on the form was not in fact made by her.

8   Bacon argues the claim as if Helen Webster was the sole account holder and the only person

9   authorized to execute the forms.  The accounts in question, however, were joint accounts held

10  by both Clarice Webster and Helen Webster.  The bank investigator testified that he had

11  Clarice Webster provide signatures on the form representing both her own signature and her

12  version of Helen Webster's signature because Clarice Webster would sign checks both for

13  herself and for her sister on the joint account.  The investigator testified that he did this so that

14  he could compare the two signatures made by Clarice Webster, both for herself and for her

15  sister, to the signatures on suspect checks.  Thus, to the extent that the affidavit of claim

16  forms had any relevance at trial, the matter was fully explored before the jury.[7]

17          Seventh, because the accounts in question were joint accounts, Clarice Webster

18  indisputably had the authority to sign the affidavit of claimant forms in her own right, which

19  she in fact did.  Whether or not Helen Webster also signed the forms was immaterial.[8]

20          Finally, to the extent that petitioner raises a claim of impropriety based upon use of

21  banking documents vis-à-vis the grand jury proceedings, any such possible error, if any, was

22

23          [6](...continued)

24  introduced by the State at trial were produced by the bank in response to a subpoena, and Bacon did not
    object  at trial to the introduction of any of the checks and related banking records.  See,e.g., #60, Ex. 87,

25  Part A, at 56-58.  In short, Bacon was convicted based upon checks and other bank documents that were
    introduced without a trial objection, not based upon the affidavit of claim forms.

26

27          [7]#60, Ex. 87, Part A, at 46-50 & 68-74.  Petitioner filed what he represents to be a copy of the
    affidavit of claim forms at #52, Ex. A.  Both forms are directed to joint accounts held by both sisters.

28          [8]See, e.g., #60, Ex. 87, Part A, at 73-74.

1  rendered harmless by the subsequent conviction before the petit jury.  *Cf. United States v.*

2  *Mechanik, supra,* note 2.

3       The Court accordingly holds, on *de novo* review, that, even if, *arguendo*, Ground 2 is

4  fully exhausted and not procedurally defaulted, the claim is completely without merit.

5       Ground 2 therefore does not provide a basis for federal habeas relief.

6       **Ground 3: Sufficiency of the Evidence**

7       In Ground 3 of the amended petition, petitioner challenges, *inter alia*, the sufficiency

8  of the evidence supporting his conviction on the multiple counts of burglary, forgery, and theft.

9       The evidence presented by the State at trial included the evidence summarized below.

10  Bacon did not testify or put on any witnesses at trial.  The State had Bacon's grand jury

11  testimony read to the jury during its case-in-chief.[9]

12       The charges upon which Bacon was convicted were based upon his cashing of checks

13  drawn on accounts held jointly by Helen Webster and Clarice Webster on the dates of

14  September 22, September 24, October 19, October 30, and November 29, 2003.[10]

15       In 2003, Clarice Webster and Helen Webster both were 85 to 86 years old.  Up through

16  1999, the sisters had been living in different cities, with Clarice living in Las Vegas, Nevada,

17  and Helen living in Palm Springs, California.  Then, in 1999, after Helen Webster sprained her

18  ankle, she started living in Las Vegas with her sister.  Beginning in the summer of 2002, the

19  two sisters lived in a one bedroom apartment, with both sisters sleeping in daybeds in the

20  living room.[11]

21       / / / /

22

23     [9]#60, Ex. 85, Part B, at 127-29.  The Court makes no credibility findings or other factual findings
regarding the truth or falsity of the evidence at trial, and it summarizes the evidence solely as background to

24  the issues presented.  No statement of fact in describing trial testimony constitutes a finding of fact or
credibility determination by this Court.  Further, the Court does not summarize all of the evidence presented

25  at trial.  The Court instead summarizes the evidence most pertinent to the petitioner's challenge to the
sufficiency of the evidence.

26

27     [10]See #60, Ex. 88, Jury Instruction No. 3 (pertinent portions of indictment).

28     [11]#60, Ex. 86, Part A, at 4-8 (caregiver Sarah Jackson); #60, Ex. 86, Part B, at 124 (apartment
manager Andrew Weiss).

According to the collective testimony of health care providers, caregivers, and the apartment manager, over the time period of 2002 and early 2003, neither sister moved around very much, spending much of the time in their daybeds.  Of the two, Helen Webster was  in poorer condition, rarely ever getting up and moving around.  They would rarely go out or receive visitors.  For extended periods of time, the two elderly women would not move around or be able to move around to get food or drink or to go to the restroom.  They on occasion would have to be hospitalized after becoming dehydrated, malnourished, unable to stand, and mentally confused.  The apartment would smell of urine and/or excrement.[12]

In approximately April 2003, Helen Webster's condition deteriorated to the point that she was moved by state authorities from the apartment.  She was taken first to an elder acute care facility and then, on July 16, 2003, from there to a nursing home outside of Las Vegas in Henderson, Nevada.  Webster remained in the nursing home continuously thereafter until her death in May 2005.[13]

In approximately July 2003, Clarice Webster fired her caregiver, Sarah Jackson, because Webster did not want to take her medication and did not want to get up and walk around the complex, as Jackson had been pressing her to do.[14]

Sarah Jackson's boyfriend, Richard McBain, had helped previously with driving, such as driving Jackson to do shopping for Webster.  McBain helped Clarice Webster as a *de facto* caregiver for approximately two weeks, but he did not feel qualified to act as a caregiver. McBain recommended Wanda Martin to Clarice Webster as someone he knew that was doing work of that nature, and Webster hired Martin.  #60, Ex. 86, Part A, at 37-38.

---

[12]#60, Ex. 86, Part A, at 8-14, 27-31 & 33-34 (caregiver Sarah Jackson); *id.*, at 34-37 & 40-41 (Richard McBain, as to Clarice Webster); #60, Ex. 86, Part B, at 113-123 (apartment manager Andrew Weiss); #60, Ex. 87, Part A, at 25-39 (Dr. Arezo Fathie, M.D.); see also #60, Ex. 86, Part A, at 56-72 (Dr. Agnes Mortel, M.D.).

[13]#60, Ex. 86, Part A, at 12, 15 & 33 (caregiver Sarah Jackson); *id.*, at 35 (Richard McBain); *id.*, at 51-55 (nursing home medical director); #60, Ex. 86, Part B, at 115 (Andrew Weiss).

[14]#60, Ex. 86, Part A, at 12-13 & 31-32 (Sarah Jackson); *id.*, at 35 (Richard McBain); #60, Ex. 86, Part B, at 120-21(Andrew Weiss).

1    McBain testified that he met Percy Bacon at Wanda Martin's home and that Bacon and
2    Martin were a couple.  In his grand jury testimony, Bacon admitted dating Martin, although he
3    denied that he lived with her, despite records indicating a common address.[15]

4    McBain testified that he continued to check in on Clarice Webster for another
5    approximately six to eight weeks, until he received a call from Wanda Martin.  According to
6    Martin, Webster had been taken from the apartment by social services.  McBain could not find
7    out any information as to Webster's whereabouts thereafter because he was not a relative.[16]

8    The five checks upon which the charges were based all were cashed subsequent to
9    the time that Wanda Martin began working as a caregiver for Clarice Webster at some point
10   after July 2003.  In his prior testimony, Bacon expressly admitted that he cashed four of the
11   five checks upon which the charges were based.  He maintained, as discussed further *infra*,
12   that he had a blanket authority from Helen Webster to do so, following upon an alleged
13   longstanding friendship with her.

14   It thus was undisputed that, on or about September 22, 2003, Bacon cashed check
15   number 2814 drawn upon an account held by the Webster sisters in the amount of $3700.00
16   at a Moneytree financial services center branch in Las Vegas.  Bacon admitted that Helen
17   Webster did not give him the check, that he instead went to the apartment to get the check
18   himself, that he wrote the check, that he signed Helen Webster's name to the check, and that
19   he took the check to the Moneytree branch and cashed it for $3700.00.[17]

20   The Moneytree teller testified that Bacon told her that his grandmother had given him
21   the $3700.00 check to purchase a car.  The teller called directory assistance to obtain a
22   telephone number for the address shown on the check.  The teller then called the number,
23   and she spoke to an individual who stated to the teller that she was Helen Webster.  The
24   teller did not ask further for a social security number or date of birth.  The individual stated to

25

26   [15]#60, Ex. 86, Part A, at 37-38, 41-45 & 49-50 (McBain); #57, Ex. 1, Part D, at 113-116 (Bacon).

27   [16]#60, Ex. 86, Part A, at 38-39.

28   [17]#57, Ex. 1, Part D, at 98-99.

-13-

the teller that she had written the check.[18]  According to the evidence presented by the State at trial, as of that time, Helen Webster was incapacitated in a nursing home in Henderson, and she no longer was at the apartment in September 2003.

It further was undisputed that, on or about September 24, 2003, Bacon cashed check number 2868 drawn upon an account held by the Webster sisters in the amount of $5,000.00 at a Bank of America branch in Las Vegas.  The check was signed by Clarice Webster. Bacon testified that Helen Webster gave him the check as a loan to help pay for a truck. However, the memo line on the check instead stated: "personal loan for family emergency." Bacon admitted cashing the check and receiving the money.[19]

The signature on the check did in fact appear to be Clarice Webster's signature, but the remaining writing as to the date, payee and amount was not necessarily by the same hand.[20]

According to the State's evidence at trial, Helen Webster was incapacitated in a nursing home in Henderson at the time that Bacon claimed that she provided him with the $5,000.00 check in September 2003.

It further was undisputed that, on or about October 19, 2003, Bacon cashed check number 2622 drawn upon an account held by the Webster sisters in the amount of $250.00 at a Moneytree branch in Las Vegas.  Bacon admitted that he got the check out of a drawer at the apartment, that he wrote the check, that he signed Helen Webster's name to the check, and that he took the check to the Moneytree branch and cashed it for $250.00.  He testified before the grand jury that he used the proceeds for parts and labor for his vehicle.[21]

It further was undisputed that, on or about October 30, 2003, Bacon cashed check number 2830 drawn upon an account held by the Webster sisters in the amount of $7,000.00

_____

[18]#60, Ex. 86, Part A, at 106-112 (teller Ninoshka Cruz); see also *id.*, at 73-90 (branch manager).

[19]#57, Ex. 1, Part D, at 99-101.

[20]See #60, Ex. 87, Part A, at 75-77, 91-93 & 96-98 (bank investigator Christopher Thompson).

[21]#57, Ex. 1, Part D, at 101-02; see also #60, Part A, at 78 (branch manager).

at a Bank of America branch in Las Vegas.  The check was signed by Clarice Webster.  Bacon admitted cashing the check and receiving the money.  He further admitted that he was the individual cashing the check in a bank security camera photograph of the transaction.[22]

According to Bacon's testimony before the grand jury, Helen Webster gave him the check as a settlement payment for damages that she caused to his truck.  According to Bacon, at the beginning of October, he had gone into a house and left Helen Webster sitting alone in the truck with the engine running.  He heard a crash, and he went outside to find that she had backed the truck into a tree.  He did not contact the police to file an accident report.  He stated that he could not tell the grand jury who had done the repairs because "some guys that worked at a shop" had done the repair work out behind the business and had used parts that were purchased illegally.[23]

The Bank of America teller testified that Bacon told her that the check was a settlement check for a car accident.  Bacon told her that two ladies in a car had hit his car and that they wanted to settle the matter out of court without calling the police.  The teller called to verify the check, and she spoke to an individual who stated to the teller that she was Clarice Webster.  The individual stated to the teller that she had written the check.  The teller further verified the signature against an exemplar faxed over by the bank.[24]

According to the evidence presented by the State at trial, Helen Webster was incapacitated in a nursing home in Henderson at the time that Bacon testified that she ran his truck into a tree in early October 2003 and then gave him the $7,000.00 check in settlement for the alleged damage from the alleged accident.

With regard to the fifth and final check, Bacon was not asked any questions directed specifically to that particular check during his grand jury testimony.  The State presented evidence at trial that on or about November 29, 2003, Bacon cashed check number 2640

---

[22]#57, Ex. 1, Part D, at 102-106.

[23]*Id.*

[24]#60, Ex. 87, Part A, at 6-22 (Stephanie Dunn).

-15-

1    drawn upon an account held by the Webster sisters in the amount of $2,000.00 at a
2    Moneytree branch in Las Vegas.

3        The Moneytree teller testified that she cashed a check for Bacon drawn on the account
4    for $2,000.00 that purported to be signed by Helen Webster.  Bacon told her that the check
5    was for a loan by a female relative, either an aunt or a grandmother.  The teller obtained
6    Helen Webster's telephone number from the phone book, and she called the number.  An
7    individual at the number identified herself as Helen Webster and stated that she had written
8    the check.[25]  According to the State's evidence at trial, Helen Webster was incapacitated in
9    a nursing home in Henderson at the time, and she no longer was at the apartment.

10       During his grand jury testimony, Bacon provided the following history regarding his
11   alleged friendship with Helen Webster.  According to Bacon, he and Webster had been
12   friends since 1999.  He testified that they went to private poker parties where he played and
13   she watched, and that he visited her at the apartment numerous times, including during
14   September through November 2003.[26]

15       Bacon maintained that Webster left the checks in her bedroom and that he had total
16   access to the bedroom to use the checks.  According to Bacon, Webster voluntarily allowed
17   him to write the checks on her account.  He told a story of being at a park on the Saturday
18   before Easter 2002 with Helen Webster and his niece.  Webster reportedly gave Bacon her
19   checkbook for him to go buy an Easter basket for the niece, who then became concerned that
20   her uncle might get into trouble for using Webster's checks.  According to Bacon, when he
21   returned, Helen Webster had given the niece a note on a napkin stating that he had
22   permission to act regarding anything pertaining to the checking account.  Bacon testified that
23   the niece kept the napkin in her diary from that point forward.  Unfortunately, however, as the
24   story went, the niece had been murdered only a short time before the grand jury proceeding.
25   She therefore could not testify to verify his story, and her diary with the alleged note on the

26   _____

27       [25]#60, Ex. 86, Part A, at 91-103 (Sharon Muico).

28       [26]#57, Ex. 1, Part D, at 92-97.

napkin had not been found.  Bacon further testified that he had given Webster a cell phone and that, if only the phone could be found, investigation would show that his was the first number stored in the phone.[27]

Bacon denied ever having met or known Clarice Webster, and he maintained that he had only known of her.[28]

Bacon testified that he possessed a key to the Webster apartment and that he came and went as he pleased.  He testified that he had unrestricted access to the apartment up through on or about December 10, 2003, which would have been after the cashing of the November 30, 2003, check.  He asserted that he went to the apartment to retrieve some things on that date, that he could not get in, and that he was informed that Webster was in the hospital.  He further testified that he last talked with Helen Webster on or about December 6, 2003.[29]

None of the State's witnesses that knew the Webster sisters had ever seen Bacon with Helen Webster.[30]

Christopher Thompson was the bank investigator who investigated the suspect checks for Bank of America, which was the bank that the checks were drawn on.  Thompson testified, on cross-examination by Bacon and without any objection by him, that Clarice Webster stated to him that the purported signatures on the suspect checks by Helen Webster were not made either by Helen Webster or by Clarice Webster signing for Helen Webster.[31]  Bacon of course admitted in his grand jury testimony that it was he that signed Helen Webster's purported signature on check numbers 2814 and 2622.  And the circumstances surrounding the cashing

---

[27]#57, Ex. 1, Part D, at 95-96, 107, 109 & 111-12; *id.*, Part E, at 118-123.

[28]#57, Ex. 1, Part D, at 95, 100, 101 & 102; *id.*, Part E, at 120.

[29]#57, Ex. 1, Part E, at 121-23.

[30]#60, Ex. 86, Part A, at 10-11 (Sarah Jackson); *id.*, at 38 (Richard McBain); #60, Ex. 86, Part B, at 119-20 (Andrew Weiss).

[31]#60, Ex. 87, Part A, at 46-53, 68-70, 81, 85 & 87.

-17-

1    of check number 2640 on or about November 29, 2003, tend to belie any suggestion that

2    Helen Webster, who then was incapacitated in a nursing home, had anything to do with the

3    signing or cashing of that check.

4          Thompson further testified with regard to the two checks signed by Clarice Webster,

5    *i.e.*, check number 2868, which was cashed on or about September 24, 2003, and check

6    number 2830, which was cashed on or about October 30, 2003.  The bank did not credit back

7    the sisters' account for these two checks because it appeared that it was Clarice Webster's

8    signature on these two checks.  The bank did not provide a credit back on blank checks that

9    were signed by an account holder, even if the check had been misappropriated and/or

10   altered.  According to Thompson, as between the bank and the account holder, the account

11   holder was responsible for loss and misappropriation or misuse of blank checks that had been

12   signed by the account holder.  For the bank's purposes, such a misappropriated signed blank

13   check was an altered check and not a forged check.[32]

14         By the time of the trial, Helen Webster had passed away, and Clarice Webster had

15   been declared incompetent and therefore could not legally testify.[33]

16         On the direct appeal, the Supreme Court of Nevada rejected the challenge to the

17   sufficiency of the evidence presented to that court on the following grounds:

18

19                    . . . Bacon contends that insufficient evidence was
           adduced at trial to support his forgery, burglary, and theft
20         convictions.  Bacon claims that lack of authority is an essential
           element of the crime of forgery, and that the State's failure to
21         establish his lack of authority through competent evidence
           renders his conviction improper.  Bacon further argues that if the
22         forgery convictions are invalid, by necessity, so too are the
           burglary and theft convictions.   Our review of the record on
23         appeal, however, reveals sufficient evidence to establish Bacon's
           guilt beyond a reasonable doubt as determined by a rational trier
24         of fact.  We specifically note that Christopher Thompson, a fraud
           investigator for Bank of America, testified that he asked Clarice
25         Webster about "Percy Bacon and she did not know a Percy
           Bacon."  We conclude that a rational juror could reasonably infer

26   _____

27   [32]#60, Ex. 87, Part A, at 75-77, 91-93 & 96-97.

28   [33]#60, Ex. 87, Part A, at 98-102.

1
2
3
4
5

> from the evidence adduced at trial that Bacon did not have authority to present Clarice Webster's checks for payment and that he forged or altered her checks, entering Money Tree and Bank of America locations with the intent to commit forgery, and committed theft by falsely representing that he was an authorized payee. It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict.

6   #61, Ex. 125, at 3-4 (citation footnotes omitted).

7   The Nevada Supreme Court's rejection of the petitioner's challenge to the sufficiency

8   of evidence was neither contrary to nor an unreasonable application of clearly established

9   federal law.

10   On a challenge to the sufficiency of the evidence, the habeas petitioner faces a

11   "considerable hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003). Under the

12   standard announced in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560

13   (1979), the jury's verdict must stand if, after viewing the evidence in the light most favorable

14   to the prosecution, any rational trier of fact could have found the essential elements of the

15   offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d at 992. Accordingly, the reviewing

16   court, when faced with a record of historical facts that supports conflicting inferences, must

17   presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer

18   to that resolution, even if the resolution by the state court trier of fact of specific conflicts does

19   not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to

20   the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333

21   F.3d at 992. When the deferential standards of the AEDPA and *Jackson* are applied

22   together, the controlling question for decision on federal habeas review thus becomes one

23   of whether the Nevada Supreme Court's decision reflected an unreasonable application of

24   the *Jackson* standard to the evidence presented at trial. *See, e.g., Juan H. v. Allen*, 408 F.3d

25   1262, 1274-75 (9th Cir. 2005), *cert. denied*, 546 U.S. 1137, 126 S.Ct. 1142, 1145, 163 L.Ed.2d

26   1000 (2006).

27   Against the backdrop of the trial evidence, the petitioner's arguments in this Court

28   regarding the sufficiency of the evidence are without merit.

1    Petitioner urges in the amended petition that "the testimony provide[d] by Money Tree
2    employees that the bank instruments were a forgery, was unsupported by the bank records
3    of Helen Webster which paid Money Tree for their services in full."[34]   It is unclear whether
4    petitioner is referring to Moneytree initially receiving a 5.9% commission on the check cashing
5    transactions, to the checks initially being honored when they first were presented to Bank of
6    America by Moneytree for payment, or perhaps to some alleged circumstance where
7    Moneytree did not sustain a loss on a charge back on a transaction or transactions.   In all
8    events, none of these circumstances or alleged circumstances would in any sense undermine
9    Bacon's conviction on the forgery charges.   Under Nevada law, a person commits forgery if
10   the person, *inter alia*, falsely makes, alters, or forges any check – or utters, publishes, passes
11   or attempts to pass as true and genuine any false, altered or forged check with knowledge
12   that the check is false, altered or forged – "with the intent to prejudice, damage or defraud *any*
13   *person, body politic or corporate,* whether the person, body politic or corporate, resides in this
14   State or not."   N.R.S. 205.090 (emphasis added).   The State did not have to prove that the
15   entity that cashed the check, *i.e.*, Moneytree on three of the transactions, ultimately sustained
16   a loss in order to prove forgery.   The evidence at trial amply supported an inference that the
17   checks were cashed with an intent to prejudice Moneytree and/or Bank of America and/or the
18   account holders.[35]   Who ultimately bore the loss on a transaction as between the three is
19   immaterial.
20       Petitioner next urges that "the bank instruments that were process[ed] by Bank of
21   America, were written and endorse[d] by the hands of Clarice Webster and was not an act
22   of forgery and the petitioner was not charged with obtaining money under false presense[s]
23   that was not a part of the charged offense."   Petitioner again fails to take into account the
24   express language of Nevada's forgery statute.   Under Nevada law, a person commits forgery

25   _____

26       [34]#26, at 7.

27       [35]*See,e.g., Patin v. Sheriff, Clark County*, 92 Nev. 673, 557 P.2d 708 (1976)(where a person in
     possession of a forged instrument seeks to pass it, it is permissible to infer that the person acted with the
28   fraudulent intent necessary to support a charge of forgery).

1    if the person, *inter alia*, "falsely *makes*, *alters*, forges or counterfeits any . . . check . . . or

2    utters, publishes, passes or attempts to pass, as true and genuine, any of the above-named

3    *false*, *altered*, forged or counterfeited matters [which includes checks] knowing it to be *false*,

4    *altered*, forged or counterfeited."  N.R.S. 205.090 (emphasis added).  The crime of forgery

5    as defined by the Nevada statute extends not only to checks that are forged but also to false

6    or altered checks, such as the two checks signed by Clarice Webster.[36]

7        Petitioner additionally contends that the bank records were presented to the jury in

8    violation of his privacy rights and those of Helen Webster and further that the bank's

9    investigator did not have authority to obtain copies of the bank instruments or to investigate

10   the matter.  The Court rejects these arguments – which go to the admissibility rather than the

11   sufficiency of the evidence  – substantially for the reasons discussed above under Ground 2.

12   The Court further notes that Bacon of course had no privacy rights vis-à-vis the Webster

13   sisters' bank accounts.

14       Ground 3 therefore does not provide a basis for federal habeas relief.[37]

15       IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus shall be

16   DENIED on the merits and that this action shall be DISMISSED with prejudice.

17       IT FURTHER IS ORDERED that the petitioner's motion (#75) for immediate relief,

18   which constituted the most recent of the petitioner's multiple requests for an immediate grant

19   of his petition, is DENIED.

20       / / / /

21       / / / /

22       / / / /

23

24       [36]*See,e.g., Hill v. Sheriff, Clark County*, 95 Nev. 438, 596 P.2d 234 (1979)(defendant who signed his

25   own name as payee on stolen traveler's checks committed forgery within the meaning of the forgery statute
     by virtue of his unauthorized alteration of the instrument).

26       [37]The Court has assumed, *arguendo*, that the petitioner's challenges to the sufficiency of the

27   evidence in Ground 3 are sufficiently similar to those presented on direct appeal by counsel and therefore are
     exhausted.  To the extent that the sufficiency claims presented in this Court are not exhausted, the Court

28   rejects the claims on *de novo* review, for the reasons assigned in the text.  Petitioner's arguments, at bottom,
     are nothing more than confused and convoluted "jailhouse logic" arguments without any arguable merit.

1         The Clerk of Court shall enter final judgment accordingly in favor of respondents and

2   against petitioner, dismissing this action with prejudice.

3         DATED: January 26, 2009.

4

5

6                                         _____

7                                       KENT J. DAWSON
                                    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28